We will hear argument next in No. 222230, Cardiovalve v. Edwards Lifesciences. Good morning, Your Honors. May it please the Court, my name is Sarah Horton. I am representing appellants today, Cardiovalve. I'd like to reserve three minutes of time for rebuttal. The Board canceled claims of Cardiovalve's 341 patent by misapplying the legal standards related to obviousness, and by specifically employing obvious-to-try legal framework in a situation where the missing limitation of the 341 patent is found nowhere in the prior art. An invention is not obvious-to-try where only vague prior art guides an inventor towards a particular solution. Obvious-to-try is not employable where the prior art only gave general guidance, and that is the situation we have here. The issue, the missing limitation, is whether to couple a leaflet... When you talk about a solution in the prior art, sometimes we talk about prior art as documents, and sometimes we talk about it as the body of knowledge, whether written down or in the heads of the relevant artisan, is available for that group of people to use. Why would one think that taking the Supreme Court's paragraph on obvious-to-try as the frame, as I think the Board did, that one would have to find these known solutions in something other than the heads of the skilled artisan? So I think the KSR quote... You have other arguments, but you began with this one. I did, yes. And I think this is the most important one, because this is the legal framework by which the claims are canceled, and I think that's the de novo review standard, which we're most interested in talking about in any event. But the KSR paragraph about a finite number of identified predictable results, I think, is really where this draws from. The identified, I think, refers to in the prior art. An obvious-to-try framework is difficult to apply where that is not the case. Can I ask you to just interrupt for a second? I think what you're saying is that the finite solutions actually have to be expressly spelled out in the reference, right? Correct, yes. And so if they're not expressly spelled out, then that's violative of the obvious-to-try rationale? I think that's correct, especially in the obvious-to-try world, you have a bigger problem with hindsight bias. And if the element is not known in the prior art and can simply be substituted by post hoc obvious opinions of an expert and nothing else that's actually in the prior art contemporaneously, then the bias towards hindsight becomes more pervasive. Why isn't that kind of a bright-line rule that you're advocating for there? I mean, you're saying, you know, whenever there's obvious-to-try, it has to expressly be in the prior art, not just something that a person of ordinary Sconey art would understand, given, you know, the suggestion in this case that the item be left behind. And then the question is whether a person of ordinary Sconey art would know that there's only a few ways that something could be left behind. Sure, I think that's part of it, but I think it's also here where the missing limitation is actually a structural element, and that's found nowhere. There are no cases that we've seen cited by the board or by Edwards where the missing structural limitation, or the missing limitation is not in the prior art and obvious-to-try is found and upheld by this court. So I think that's where we see the deficiency here. But the missing structural element, I mean, maybe it already was in Goldfarb and that there was already some kind of connecting mechanism that would connect Goldfarb's flap to the catheter. And then your expert, Dr. Sachs, said, whoa, that would be super conventional to make that coupling. Use any one of a number of well-understood conventional mechanisms, including sliding mechanisms, hinges, pins, etc., etc. And so there really were already many, many off-the-shelf types of coupling mechanisms that could be used to couple this flap to something. And there were, as I understand it, basically two different somethings. One was to the patient himself somehow, some heart tissue, and then secondly, to the actual device itself, which for a period of time was right there with the catheter. And so why not just connect now the flaps to something that was previously right next to, right inside of the catheter, i.e. the fixation device. So, Your Honor, I think to the Dr. Sachs' testimony point, I think what he was talking about there was how you would couple it mechanically to actually, I think, element 86, which is actually the catheter. So those well-known ways of coupling mechanically, we don't dispute KSR is requiring a little bit of reasoning here, and context. We aren't just sliding everything into completely separate cells and then never to look at them again when we're inside of a different cell. Instead, we're trying to look at things a little more contextually and fluidly. And in this particular instance, we know that there's well-established ways to connect the flaps to the catheter. That's what Goldfarb says, that's what Dr. Sachs says. Why would there be some reason that you couldn't likewise use those very conventional mechanisms, coupling mechanisms, to connect the flaps to the fixation device, to the clips? I think it's a matter of how you get there. What we have in the prior art is this statement that, in Goldfarb itself, that the flaps could be left behind. And that's all we have. That's our starting point. Right. And we also know that you wouldn't just leave them behind unconnected. Correct. I think everyone agrees that that would be bad. Now we know it's got to be connected to something. Correct. And then... And when you look at the pictures, the catheter and the clips are right next to each other. You could very easily fasten the flaps to something in the clips that is just about as close of an interchangeable substitute as you could get to the original coupling to the catheter. Your Honor, I think we would respectfully disagree. That's the piece that is missing from the prior art. If that was so obvious, one would think that it would have been disclosed somewhere in the prior art. That's a 102, but here we're trying to use a little bit of extra level reasoning here, not just plain old 102. So, like the court in Grunenthal and In Re Cyclobenzaprine and Leo Pharma, the court has found that obviously the TRI framework isn't applicable where there's a missing limitation. And specifically in the Grunenthal case, there, obvious to TRI, was not applicable in this court. It's a very unpredictable art about trying to find a polymorph. But in that context... Here, we're dealing with, I don't know, a different context. This is all mechanical and, again, dealing with prior coupling mechanisms that are already well known. So, Your Honor, I think that in the Grunenthal, which I agree is a different art, but here we are talking about placing a mechanism in a human's beating heart. So, it's not just mechanical, switch this out for that out. There are other considerations about how and why one of ordinary skill in the art might try to do that in that scenario. But even in Grunenthal, there, the limitation required a polymorph A, right? And then what was known was polymorph B and that polymorph studies and screening could be done. And even in that situation where those two things were known, the obvious to TRI framework was not available for the challenger of the patent there because it wasn't... The art is really unpredictable. You have no idea whether other crystalline form structures even exist at all. And so, you're kind of out to sea in the laboratory trying to piece things together to see if you can luckily hook up a new crystalline form. I mean, we're in a different world here with this mechanical... So, in Rolls-Royce as well, that was turbines for jet engines. Can you talk about the factual specifics here, which is, I guess, what has troubled me. It feels very odd to me to talk about just two possibilities, the device or the human body for the connector. And I'm trying to imagine and failing to read anything that tells me what I should be imagining about the variables. There are different kinds of tissue that you can connect them maybe at one point or maybe two points. And I'm wondering if it's not at two points, are they going to be flapping around inside the atrium even though they won't be pulled down into the ventricle? Same thing with the different components of this device and the different connectors. Obviously, nobody's talking about rigidly connecting this thing, the actual thing without an intervening connector to anything in the clip. At least nobody's explained how that would enable the top, the proximal 18 to go into the annulus and clip to the 16 and how that would even be done because you need to put post 12 down south before you pull it back up. So, it seems to me that, I don't know, to me coming into the argument, the more worrisome for the other side piece of your argument was that this does not seem like a simple small number of possibilities where the concrete how has been identified by the board that wouldn't, that would actually produce what has to be a relevant form of success. Namely, that this thing could be safely left in the atrium without a problem. And that doesn't seem to me to have anything at all to do with the source of the information about the solutions. So, I think that the concrete how, as your honor put it, is a good way to put it. And I think this is where we come to the hindsight issue which has been bothersome to CardioValve as well. To get to the concrete how of the claims, you have to take a path that goes right back to the claims and it's like you're looking for that claim to couple. And what you have to do is not just where the locations are. It is, there are potentially, yes, broadly two locations. In the heart, to the heart tissue itself or to the fixation device somewhere. These things are complicated mechanisms. And differences among them on the tissue side are apparently quite significant. It seems odd to view that as a single category since the various experts seem to have different views about whether one would even be possible versus the other. I'm not sure why it's also appropriate or why it would be any less inappropriate to view the device as a single thing for coupling not only because there are different locations on it but because there are different couplers, strings or rigid washers. And I don't understand from anything that I've read, and maybe I've missed it, how those things end up leaving these quasi-rigid flaps in a form that is safe. There must be a kind of rigidity to this otherwise they'd be just flapping around in the atrium. They might not go down into the ventricle but the flapping around in the atrium, that seems worrisome. Well, the Goldfarb 329 disclosures, specifically in 9A and B, show how the Goldfarb inventors would have done that to make sure the flaps stayed where they were supposed to stay for their intended purpose. And then you've got 16 and 18, the clips, that come around the leaflets while the flaps 109 are doing their job. If you change that mechanism to couple something else to those flaps, then you've changed how it is supposed to work. So I think that is hard to envision one of Ordinary Skill in the Art thinking, oh, I have two broad locations, I guess, for where I could couple these things from that one statement in Goldfarb 329 that says you could leave the flaps behind but then it doesn't tell you where to put them, what to do with them, it's not illustrated, it's not discussed more in an embodiment. And then you have multiple choices. Are you going to couple to the heart tissue and within the heart tissue? Is it the valve annulus? Is it the wall? Dr. Sachs said it's not the valve annulus. It has to be the wall. And there is prior art that shows that it is to the wall and that's the Zippori reference that is in the record. And then there are three other contemporaneous art references. But the annulus is out, right? Because that's what Dr. Sachs said. You're an expert. I think that the presumptively enabled prior art that is of record, which is the only evidence to Your Honor's question about what type of evidence, the contemporaneous prior art is that it could be to the wall or to the valve annulus. But what is the it? In the prior art, what is the it? The leaflet stabilizers. It's something else in the prior art, right? I'm sorry, Your Honor. A different mechanical structure? It's the prior art when you're talking about the leaflet stabilizers, which is what tamps down the leaflets, which is broadly what 109 is in the Goldfarb 329. So if you're looking to talk about how to leave behind leaflet stabilizers. Sorry, Your Honor, I might have that wrong. 104. The leaflet stabilizers, when you look to the contemporaneous art about how to leave behind leaflet stabilizers, it is to couple them either to the annulus or to the valve wall. That's what's in the prior art publications that are around at the time. The only person saying that the leaflets can be coupled to, sorry, the flaps can be coupled to the clips as required by the cardio valve patent is the conclusory testimony of Dr. Vestley, and we don't think that's enough to sustain on a substantial evidence. Can you just explain why it would be so strange to couple the flaps to coupling number 19 instead of catheter 86 when coupling number 19 looks like it's right there next to the catheter 86? Sure, it is right there, Your Honor, but that's respectfully not how one of ordinary skill in the art would think about it. The coupling number is used to come down with catheter 86 and then it stays. In order to make it work, you have to push it down. The flaps have to stay. You're pushing the entire mechanism down, and if you were to couple to the coupling member, then you would have the situation where the flaps are up here, the leaflets are here, and the clips are trying to get the leaflet, but the flaps, which are supposed to be stabilizing the leaflet, don't even do anything to keep the leaflet from flailing. What do you think is the best record evidence to support what you just said? I mean, because, you know, this seems to be a case where you've got competing expert testimony and we're supposed to determine, you know, whether there's substantial evidence. So what is your best evidence to show that Dr. Vesely's testimony can't be, is not substantial evidence to support the Board's finding? Well, I think the issue is really the legal issue there is that conclusory expert testimony just can't be enough according to the case law, especially because it's probably a limiting limitation. What if I don't think it's conclusory? Excuse me? What if I don't think it's conclusory? Well, there are no cases that have been cited where expert testimony could overcome a missing limitation in an obviousness analysis. Okay, let me ask you another question. So my question was, what evidence do you have to support how this is so unpredictable, not a predictable solution, not a finite number of solutions? Is that your expert you're relying on? Well, I think, Your Honor, we're not asking the court to re-weigh the expert testimony. I think what is most important here is that the contemporaneous art, what was in the art and known in the art, that's Liska, St. Gore, Powell, Zippery, that was in the same field by the same groups of inventors, lots of it, as Goldfarb, has to hold more weight than the say-so of a post-hoc expert. Thank you, Your Honors. Let me restart here. Thank you, Your Honors, and may it please the Court, Josh Stoll of Kenobi Martins on behalf of the Appley Edwards Life Sciences. The dispute here was narrow. It related to a single limitation in the patent claim, whether Goldfarb 329 disclosed at least one leaflet clip coupled to the annular portion or whether it rendered that obvious. There are two annular portions, and it wasn't in dispute that both of those are annular portions within the scope of the claim. The only dispute was whether a person of skill in the art would have found it obvious to couple the annular portions to the clip. And it's been alleged that the Board relied exclusively on expert testimony in resolving this, and that's not the case. The Board started with the words of Goldfarb 329. As we've already discussed today, Goldfarb 329 expressly states that the flaps may be left behind to assist in holding the leaflets. And so the Board then analyzed the evidence that was of record to determine what does that mean, and how would a person of ordinary skill in the art have interpreted may be left behind. Why do you think the Board ended up relying on this obviousness to try portion of KSR, which is typically and maybe to some extent here, relied on when you don't think you quite have a sufficiently backed up narrative of motivation to do this particular thing with a reasonable expectation of success? Yeah, I think that the Board thought that obvious to try sufficiently described the evidence that had been produced, and quite frankly, the Board was bending over backwards to give some credit to the testimony of CardioVal's expert, Dr. Sachs. The Board actually determined that Edwards' evidence was more persuasive. At Appendix 46, it states, we are persuaded by Petitioner that it would have been simpler when leaving the flaps behind in the heart post-procedure, as suggested by Goldfarb 329, to attach the flaps to the coupling member 19 or collar 131 rather than to the heart tissue. So the Board found Edwards' evidence more persuasive, but it goes on to state, I believe it's in footnote 16, that even if you could attach, even if CardioVal were correct, that the flaps could be attached to the heart wall somehow, that that would have been one of two predictable options, and that it still would have been obvious to a person of skill in the art to couple the flaps to the clips. And the Board cited the testimony of Edwards' expert, Dr. Vesely. When determining that, Dr. Vesely testified that the flaps could be coupled to the clips and did not stop there. His testimony was not conclusory. Dr. Vesely went on to explain why a person of skill in the art would have been motivated to couple the flaps to the clips. One was so that the flaps remained securely anchored to the atrial side, the top of the leaflets, by attaching the flaps to... Just to be clear, every time that people are using the expression coupling the flaps to the clips, they are not referring to the thing that immediately comes to mind, which is flap clip. You're talking about something that's indirect, because I don't see anybody suggesting, and I at least can't imagine, how the flap can be connected to 18 or 16, the top and bottom of the clips. You're talking about connecting it to some little piece, 19, the coupling member that seems to stay in place after the clips are closed and there's a little thing sticking up. Is that... Correct, Your Honor. The board found to start, in terms of framing the issue, that the claims did not require a direct coupling to the clips. It could be indirect, and so the board pointed to the portion of the clip that remains behind with the clip, the coupling member. It has to be indirect, doesn't it? There was evidence...  ...and not actually touch, through the hole in the angles, and not actually touch. And also, the bottom of it goes down further than you can, because it has to move down below the leaflets, so that the 16s, the distal portions, can get clearance to open up. Is that... You've described how the clip works, Your Honor. You've described that accurately. Just to be clear, you agree that the flaps could not possibly be directly connected to either the proximal elements or the distal elements of the clip, 16 and 19. They've got to be... The flaps have to be directly connected to something else in the overall device. Correct. The evidence that was submitted is that the flaps would be connected to the coupling member that's left behind with the clip. Dr. Vestley explained that a person of skill in the art would have reasonably expected success in doing that, because Goldfarb 329 explains that the flaps have cutouts in them to accommodate the movement of the proximal elements, and so they are specifically designed to be used in conjunction with the clip. He also explained that by coupling the flaps to the coupling member, that does remove it a little further from the moving parts of the device, and therefore there wouldn't be any interference between the devices. The board also noted that the devices or means for coupling the flaps to the clips were within the technical grasp of a person of skill in the art, and I don't think this is in dispute. Dr. Vestley had testified that a person of skill would have used kind of the well-known coupling mechanisms available at the time, such as rods, pins, hinges. Some of these are even disclosed in Goldfarb 329 to attach other devices to each other. Dr. Sachs agreed that those types of mechanisms were, quote, or that a post-theta would have used, quote, any number of conventional mechanical binding or hinge-like mechanisms. He went on to describe such mechanisms as obvious design features, very standard, conventional, and well within the state of the art. So there was really no need to dispute. Would the connecting mechanism have to prevent these semi-rigid flaps from flapping up if they're connected only at one point on this 19th? It's not quite a post, but it's something like a post at the vertex, right? Correct, and as Dr. Vestley explained, the hinges can easily be used to securely anchor the flaps to the atrial side of the device. In fact, there are similar hinges shown for the proximal and distal elements in the 329 patent already that are already there. So they would hold those flaps firmly against the atrial side, and that was the evidence submitted by Edward's expert on that point. I'll also just briefly respond to this. Could you remind us what did the other side, Cardioval, say about, as a technical matter, why it cannot be that you would couple the flaps to the coupling number 19? Yeah, I don't believe Cardioval specifically rebutted the allegation or our position that the flaps could be coupled to the coupling number. They generically stated that that would be unpredictable and instead pointed to other types of art where a device was stapled or glued to the heart valve annulus. Okay, can I just refresh my recollection? Did Dr. Vestley, in his first declaration, the one with the petition, call out coupling number 19? He did, Your Honor, yes, he did call that out. In the petition? In his declaration. In the reporting petition. Correct, correct. That didn't come up in your reply to the preliminary patent owner response? I believe it was in the petition, but I can certainly check, yeah. And he gave the reasons for that, the motivation for that, that it would simplify the deployment, the whole device could be delivered in one procedure, that it could be detached from the delivery device at one time, that it would be safer for the patient, that the procedure would take less time. So he went through all the different motivations to couple the flaps to the clip. The Board also based its decision on its analysis of the evidence submitted by CardioValve as well. The Board noted at Appendix 46 the substantial challenges that would have arisen by the methods described by CardioValve, particularly trying to staple or glue these flaps inside the human heart while it was beating. And while there's low visibility, that was one of the bases for why the Board found Edwards' evidence more persuasive that a person of ordinary skill in the art would have found it obvious to couple the flaps to the clips. The Board also noted Dr. Stax's inconsistent testimony. Initially, he opined that a person of skill in the art would have coupled the flaps to the heart valve annulus. During his deposition, he recanted that testimony and said, no, in fact, the flaps would be attached somewhere to the heart valve wall. What is the evidence and what are the legal requirements  Well, the way that KSR has articulated that test was that the person of skill in the art needs to, there needs to be an articulated reasoning with some rational underpinning. The analysis does not need to seek out precise teachings directed to the specific subject matter of the challenged claim. What you're reading from, or quoting, is not from the paragraph. Was it 421 in KSR on obviousness? Correct, correct. I'm not sure whether that answers the question. I guess if you're getting to the point about what's required, it needs to be a finite number of options with a predictable result. And you don't think you have to also show that, and you're talking about predictable result, is that the likelihood of success or is it both? Is it that it's predictable in terms of the person born in the art, we think of it as a solution, but also it has to be a solution that's likely to succeed? I think those are explaining the same requirement there, that predictability is describing an expectation of success. And so here the board found not only that it was predictable, Dr. Vestley also explained why there would be an expectation of success. And, again, that goes to Goldfarb 329's description of the flaps as having these cutout regions so that they can function in conjunction with the other portions of the device. They're supposed to operate together in unison. Also, Dr. Vestley's opinion that if the flaps are coupled to the coupling member, that that removes it slightly from the clip and would secure the device on the atrial side of the leaflets. He also provided... Is it relevant to ask whether leaving the flaps behind would ever be reasonably expected to have success? Or does one just take that as a given because of the clause in Goldfarb 329 that says they might be left behind without any explanation of whether that would be an okay thing for the patient? Correct, Your Honor. That would be taken as a given because it's disclosed in the prior art and there's really no dispute that it's by cardio valve that the flaps wouldn't be left behind at all. Both experts opined that the flaps, the person of skill in the art would have found it obvious to leave the flaps behind. The dispute was just how a person of ordinary skill would find that. The Board at some point in its opinion said that statement about leaving the flaps behind is a statement of fact. It's not an invitation to speculate about how it might or might not be possible to do that. Correct, Your Honor. The Board did say that, yes. Can I ask two extremely small questions, one of which is wholly irrelevant and I'll get to that later. There are these, I can't pronounce it, chordae tendonae coming off the bottom of the leaf. Is that right? That's correct, Your Honor. How does distal number 16 interact with those? It goes between the chordae. So it's actually that chordal connection to the muscle that's in the, or whatever it's called, I guess it's a muscle in the ventricle. That's correct, Your Honor, yes. And now for the trivial question. Is your goldfarb related to the goldfarb of goldfarb against Cooper, the interference cases he had, and Bard against Gore? My understanding is it's the same goldfarb. He was a prolific inventor. The same goldfarb. Sorry, Your Honor? The same goldfarb, not his son. It may have been his son. I'm not sure of the ratio, but there's a relationship between them. It's a name that's been in, could be a relationship with his son. Could be, yes. If there are no further questions, I will see the rest of my time. Thank you. Thank you, Your Honors. I'd like to start with Dr. Sachs and his supposed admissions, which say nothing about disclosure in the art of coupling clips to flaps. The admissions from Dr. Sachs and what Dr. Sachs was saying on the record was all about where you would couple to the native heart tissue itself. The coupling to the native heart tissue itself is the closest prior art we have about how to leave behind flaps. It would never be the atrial wall, not the annulus, right? Well, Sachs talks about the atrial wall, and then there is prior art talking about the annulus. Because he said you wouldn't do it to the annulus because that would affect the operation. That is what he said, correct. And your prior art references were about examples of connecting something to a valve annulus. The stabilizers to the annulus, that's right, except for a zippery, which is to the atrial wall. Correct. So I think the discussion of Dr. Sachs and what that evidence presents is, look, a cardio valve doesn't have a burden to show obviousness here. The board, in fact, said that a cardio valve doesn't have a burden to show non-obviousness here. So faulting the closest prior art in a situation where there is no prior art and no other evidence other than the conclusory statements of Dr. Vesely, it doesn't exist in the prior art to couple the flaps to the clips. The prior art that we have here, Gulf Harbor 329, only says it may be left behind. That, in our view, is not enough for an obvious-to-try legal framework where the prior art is only a vague suggestion about what to do next and there is no guidance about how to come to the conclusion of the patented invention here. Using an obvious-to-try framework in this scenario is replete with hindsight. The only way to get to the missing structural limitation is to take the obvious-to-try framework and have it be guided by what you're trying to find, which is coupling the leaflets to the flaps. The only place we have that anywhere is in the 341 patent itself to cardio valves. The board asked the wrong question, we think. It's not whether it could possibly work to couple the clips to the flaps. It's what was known to POSA at the time of the invention, and that just decidedly was not known. There is no cases that we have seen from the board or from Edwards in the briefing where a missing structural limitation is found to be obvious-to-try. Can I ask you my likelihood-of-success argument? I don't see you making a likelihood-of-success argument, but do you think the likelihood-of-success requirement is separate from the predictability requirement? I do, Your Honor, and that is something that, because of how this came up in the proceeding during the oral argument itself, that CardioValve did not have a chance to add expert testimony or cross-examine on because the obvious-to-try scenario was something that was not put forward until actual oral argument, and then the parties had seven pages. I don't see where you're arguing a lack of likelihood-of-success on appeal. Am I missing that? I don't think you necessarily are, Your Honor. Okay. So CardioValve asked for reversal for the reasons stated in our briefing. Thank you very much. Thank you. Thank you.